IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD DALE MILLER,                    : Civil No.  1:23-CV-1920
                                        :
            Plaintiff                   :
                                        :
    v.                                  :
                                        : (Chief Magistrate Judge Bloom)
CAROLYN W. COLVIN,                      :
Commissioner of Social Security,[1]     :
                                        :
            Defendant                   :

## MEMORANDUM OPINION

## I.    Introduction

Richard Miller filed an application for disability and disability benefits on June 8, 2021. Following an initial hearing before an Administrative Law Judge ("ALJ") the ALJ found that Miller was not disabled from his onset date of disability of June 4, 2021, through November 8, 2022, the date of the ALJ's decision.

---

[1] Carolyn W. Colvin became the acting Commissioner of Social Security on November 30, 2024. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Carolyn Colvin is substituted for Kilolo Kijakazi as the defendant in this suit.

Miller now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and keeping in mind that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.   <u>Statement of Facts and of the Case</u>

On June 8, 2021, Miller applied for a period of disability and disability insurance benefits, as well as supplemental security income, citing an array of physical and mental impairments, including broken ribs, a fractured shoulder, numbness in feet, inability to walk, and memory loss. (Tr. 119). Miller was 29 years old at the time of the alleged onset of disability, had at least a high school education, and had past employment as a garbage collector and farm hand. (Tr. 26).

With respect to these alleged impairments, the record revealed the following: Miller was injured in an on-the-job motor vehicle accident on

June 4, 2021, while working as a garbage collector. (Tr. 832). The truck rolled over, causing Miller to hit his head on the roof of the truck before being ejected through the windshield. (*Id.*). Miller suffered many injuries, including, *inter alia*: impalement damaging internal organs, damage to his buttocks and colon that required surgery and an ostomy, a broken right shoulder, multiple broken ribs, acuate fractures of bilateral L2, L3, and right L4 transverse processes, a closed head injury from where his head dented the garbage truck, a collapsed lung which required a chest tube, and a left-sided type 3 open Ischial tuberosity fracture with significant soft tissue injury. (Tr. 575, 832-33).

On the date of the accident, Miller was admitted to Hershey Medical Center ("HMC"). (Tr. 425). That day, Miller underwent surgery for a traumatic perineal laceration involving anal sphincter complex. (Tr. 577). He underwent at least four procedures with the general surgery, colorectal, and plastic surgery divisions at HMC. (Tr. 575). During this initial stay at HMC, Miller also underwent a motor examination by Drs. Nicholas Pilla and Mark Knaud, who scored Miller 3/5 for his delt, bicep, tricep, finger flex, instrinsics, quad, anter tib, EHL, and GS. (Tr. 382).

There was an inpatient procedure performed by Dr. Gish on June 10, which was done to correct left hemothorax via a left-sided placement of a 32-French tube thoracostomy. (Tr. 430).  Miller was discharged from HMC on June 22, scheduled for various follow ups, and prescribed several medications, including Gabapentin, acetaminophen, Bifidobacterium-lactobacillus, lidocaine topical patches, and Oxycodone. (Tr. 434).

Miller began to consult with myriad physicians around this time. On June 23, 2021, Miller had his first appointment with Dr. Jeffrey Yocum at Yocum Associates PC ("YA").  (Tr. 566). On June 26, Miller had his first appointment with Orthopedic Associates of Lancaster ("OAL"). (Tr. 547).  At OAL, physician's assistant Hope Weber observed Miller enter using the assistance of a cane.  (*Id*).

Miller returned to HMC on June 29 for an examination by Dr. Joshua Bagley for his left scapular body fracture.  (Tr. 498).  Dr. Bagley found Miller's shoulder to be improving with minimal limitations outside of some numbness in Miller's right upper extremity. (Tr. 499.)  On July 9, 2021, Miller again returned to HMC to follow up with CRNP Stephanie Mnich about the laceration of his right buttock and perianal tissues. (Tr.

512).  She noted he walked without an assistive device, and that he complained of numbness in his right arm and lower right extremity. (*Id.*).

On August 23, Miller again treated with Dr. Yocum, who noted that Miller continued to improve, although he observed that Miller had consistent pain in his right rib cage, as well as weakness in right upper and lower extremities.  (Tr. 564).  On August 26, Miller returned to OAL, where PA Weber noted that, despite presenting with back pain and continuing to deal with constant numbness down his right leg, Miller was feeling "pretty good." (Tr. 539).

Miller returned to HMC on September 10, 2021, where CRNP Mnich observed that he entered the clinic without a cane or assistive device.  (Tr. 526).  He rated his pain a 6/10. (Tr. 526).  Miller returned to OAL on September 21, where he consulted with Dr. James Carson.  (Tr. 524).  Dr. Carson's assessment showed chronic right-sided low back pain, chronic right shoulder pain, and lumbar pain with radiation down right leg.  (Tr. 535).  At this visit, Miller reported that pain prevented him from standing for more than ten minutes but did not affect his ability to sit. (Tr. 537).

5

Miller returned to OAL on October 5, where Dr. Carson assessed his shoulder pain to be chronic. (Tr. 731). The next day, October 6, Dr. Yocum diagnosed tendinopathy of the right shoulder. (Tr. 562). Two weeks later, Dr. Yocum noted Miller was ambulating with a walker, his right shoulder showed tenderness over posterior aspect with limitation of abduction and external rotation, and he exhibited weakness in his right forearm and extensors. (*Id.*). On October 29, Miller reported to OAL, where the record shows that while Miller continued to have right shoulder and arm pain and numbness, his shoulder had a full range of motion, and all strength tests were 5/5 except for one which was 4/5. (Tr. 725).

On November 11, 2021, Miller followed up with Dr. Yocum and again complained of memory loss. (Tr. 753). On November 16, 2021, Dr. Yocum filled out a physical residual function capacity questionnaire in conjunction with Miller's application for benefits. (Tr. 734). In this questionnaire, Dr. Yocum identified Miller's symptoms as weakness extensors right forearm and right thigh, bilateral rib tenderness, right shoulder pain, tendonitis right shoulder, and memory loss. (*Id.*). He

6

identified Miller's sources of pain as bilateral rib pain, right shoulder
pain, joint pain, and chronic low back pain. (*Id.*) Dr. Yocum opined that
Miller would have frequent interference with his workday from pain. (Tr.
735). Dr. Yocum stated Miller could only walk half a city block (and only
with the assistance of a cane), sit for a maximum of 45 minutes, stand for
a maximum of five minutes, and stand or walk for a maximum of two
hours during an eight-hour workday. (Tr. 735-36). Dr. Yocum stated
that Miller needed a seven-minute walk after 15 minutes of sitting, a half
hour break four times throughout a workday, a cane to stand or to walk,
and five days off a month to manage his symptoms. (Tr. 736-38). Finally,
Dr. Yocum explained that chronic pain would affect Miller's ability to
concentrate at work, and that weakness in his right hand affected his
ability to use that hand in a work context. (Tr. 738).

On December 1, 2021, Dr. Yocum noted that Miller still had some
right-mid to low back pain, and his thoracic spine showed paravertebral
muscular spasm 3-8 right, with limitation of rotation right. (Tr. 752).
Dr. Yocum diagnosed thoracic strain, as well as memory loss. (*Id.*). Later

that month, Dr. Yocum noted Miller continued to be limited in his overall mobility and again diagnosed memory loss and thoracic strain. (Tr. 751).

Miller began treating at Drayer Physical Therapy ("DPT") in January of 2022. (Tr. 806). At his intake session with physical therapist Christopher Korba, Miller reported dizziness, imbalance, pain in the back, vertigo, and a pain level of 5/10. (*Id.*). PT Korba noted that Miller had decreased balance and cervical spine range of motion, and several functional deficits, including walking and transferring from lying to sitting. (Tr. 808). Miller had five more appointments at DPT, on January 31 and February 2, 4, 7, and 11. (Tr. 791). While DPT's records indicate Miller had a good prognosis, Miller did not attend any sessions after February 11. (Tr. 1082). Accordingly, on April 28, 2022, DPT discharged Miller for non-compliance with attendance. (*Id.*).

Miller underwent a mental status evaluation with Kathleen Ledermann, Psy.D, on February 10, 2022. (Tr. 776). Dr. Ledermann noted Miller had some memory and concentration difficulties; specifically, that he had mildly impaired attention and concentration, as well as mildly impaired memory skills. (Tr. 777-78). Dr. Ledermann also

8

noted that Miller could dress, bathe, and groom himself alone, that he could help with laundry and shopping (but not do either alone), that he cannot manage money, that he was driving (despite not being medically cleared to do so), that he could socialize, and that he could watch TV, play video games, and use the computer. (Tr. 778-79). On examination, Miller was cooperative and exhibited fluent and clear speech, mildly impaired attention, concentration, and memory, and good insight and judgment. (Tr. 777-78). Dr. Ledermann diagnosed him with generalized anxiety disorder and post-traumatic stress disorder ("PTSD"). (Tr. 779).

At a March 19, 2022, visit to HMC, Miller received a CT scan of his back and CRNP Heather Abdalla noted Miller's motor skills as 4/5 for both upper and lower extremities. (Tr. 893-95). On March 31, Miller visited Myerstown Family Practice ("MFP"), where Dr. T. Wangdi Sherpa prescribed some medical equipment and noted Miller's status post-accident, including that he found Miller's memory to be intact. (Tr. 872). Miller consulted with Dr. Alexander Mamourian at HMC on April 11, who performed an MRI of Miller's brain. (Tr. 892). The MRI results were overall normal, though Dr. Mamourian did note "the presence of some T2

9

prolongation in the craniocervical junction, but I suspect is artifactual, consider cervical cord imaging[.]" (*Id.*).

On June 21, 2022, Miller had a neurology consult with Dr. Paul Eslinger at HMC. (Tr. 977). Dr. Eslinger noted that Miller had problems with information processing speed, attention and concentration, remembering conversations, and remembering recent events. (*Id.*). Dr. Eslinger found Miller had challenges with verbal and visuospatial memory, attention, executive function, and mental processing speed measures. (Tr. 980). Dr. Eslinger also found that Miller's history and testing were consistent with persisting post-concussion sequela. (*Id.*). On July 8, Miller consulted with Dr. Jeffery Scow at HMC about the potential of surgery for ostomy reversal and sphincter repair. (Tr. 990). Dr. Scow stated in his notes that he believed Miller did not really understand the potential procedure being discussed and had post-concussive issues that may have been contributing to that difficulty. (Tr. 992).

On August 15, 2022, Dr. Yocum filled out a second physical residual function capacity questionnaire. (Tr. 994). In this questionnaire, Dr.

Yocum indicated Miller's fitness for work was less than it had been in November of 2021. (Tr. 994-99). Dr. Yocum diagnosed SIP MVA, multiple rib fractures, fracture of left shoulder, pelvic fracture, RUE paresis, colostomy, memory loss, PTSD, and thoracic strain. (Tr. 994). He noted Miller's symptoms as memory loss, continuous consistent pain, and generalized fatigue. (*Id.*). He recorded that Miller had pain consistently in his right hip, right shoulder, L-S and right elbow pain, back pain, and limited mobility. (*Id.*). Dr. Yocum stated that Miller's impairments have lasted, or are expected to last, at least 12 months, and that those impairments were reasonably consistent with the symptoms and limitations described in Dr. Yocum's report. (Tr. 994-95).

As to Miller's fitness for work, Dr. Yocum found that Miller would constantly have interference with simple work tasks from his pain and was incapable of even low stress jobs because of his memory loss and PTSD. (Tr. 995). He stated Miller could not walk any city blocks without pain, could stand for a maximum five minutes, sit for a maximum of 15 minutes, could stand or walk no more than two hours in an eight hour day, needed to get up and walk for five minutes after ten minutes sitting,

needed his legs elevated 25% of the day, needed a cane or assistive device to walk, needed ten days a month off to manage symptoms, and that his capacity for lifting and moving tasks had decreased since the previous evaluation. (Tr. 995-97). Dr. Yocum also found Miller's concentration was affected by memory loss and PTSD, and that Miller's impairments affected his ability to use both hands while working. (Tr. 998). Dr. Yocum stated Miller had been subject to those limitations since at least July 23, 2021. (Tr. 999).

A week later, on August 22, 2022, Miller underwent intake at Wellspan Health ("Wellspan") for speech therapy treatment. (Tr. 1027). Speech therapist Emily Weaver noted that Miller's memory scores were either "extremely low" or "low average," while his language and visuospatial/constructional scores were both average. (Tr. 1027). On August 29, Miller returned to Wellspan to consult with Dr. Thomas Frey about interventional pain management, at which time Dr. Frey recorded that Miller had tenderness in the lower right side of his back and prescribed medical cannabis for "severe and intractable pain." (Tr. 1076). Miller's final medical consultation on record was August 31, 2022, at

Wellspan for speech therapy. (Tr. 1018). Speech therapist Weaver noted Miller was progressing toward therapy goals but continued to have difficulty with short term memory and attention skills. (*Id.*).

It is against this factual backdrop that the ALJ conducted a hearing in Miller's case on October 19, 2022. (Tr. 35-55). Miller and a vocational expert both testified at this hearing. (*Id.*). Following this hearing on November 3, 2022, the ALJ issued a decision denying Miller's application for benefits. (Tr. 17-28). The ALJ first found Miller had not engaged in substantial gainful activity since June 4, 2021, his alleged onset of disability. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ determined that Miller had the following severe impairments: residual effects of fractures of ribs, left shoulder, and pelvis, and residual effects of colostomy. (*Id.*). At Step 3, the ALJ found that none of these severe impairments met or medically equaled a listed impairment. (Tr. 21).

Between Steps 3 and 4 the ALJ concluded that Miller:

[H]a[d] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasional postural activities but never climbing ladders,

13

ropes, or scaffolds, and he must avoid concentrated exposure
to dangerous machinery and unprotected heights.

(Tr. 22).

In reaching this RFC determination, the ALJ considered the
objective medical record detailed above, the medical opinion evidence,
and Miller's reported symptoms. As to his consideration of the medical
opinion evidence, the ALJ found persuasive the medical opinion of Dr.
David Clark, who upon review of Miller's medical record found that
Miller was capable of lifting twenty pounds occasionally and ten pounds
frequently, standing or walking for six hours, and sitting for six hours.
(Tr. 83-84). The ALJ was also partially persuaded by the opinion of Dr.
Glenda Cardillo, who also found Miller capable of standing or walking or
sitting for six hours. (Tr. 62). The ALJ found these consulting source
opinions to be "consistent with the objective clinical findings and the
longitudinal treatment records showing the claimant recovering
following the June 2021 accident." (Tr. 24). The ALJ also cited
examinations where Miller walked with a non-antalgic gait without
assistance from a cane or walker, that his strength was normal or near-

normal, and that Miller engaged in "good activities of daily living," as described above, as influential on the ultimate decision. (*Id.*)

The ALJ found Dr. Yocum's opinions unpersuasive. (Tr. 25). The ALJ found that Dr. Yocum's opinions were not consistent with the objective clinical findings and longitudinal medical records, which the ALJ noted showed constant improvement by Miller. (*Id.*). He explained that Dr. Yocum's records "do not show objective abnormalities significant enough in severity and duration to support his opinions." (*Id.*).

As to Miller's mental health impairments, the ALJ found persuasive the opinions of Drs. John Gavazzi and Richard Williams. (Tr. 25). Those consulting source opinions found that Miller's mental health limitations were no worse than mild and were expected to improve with continued speech-linguistic therapy. (Tr. 60-61, 82). In contrast, the ALJ was not persuaded by the opinion of Dr. Ledermann. (Tr. 25). The ALJ found that Dr. Ledermann's conclusion of moderate to marked limitations was not consistent with the objective clinical findings and longitudinal medical records. (*Id.*). The ALJ noted that "Dr. Ledermann's own mental status examination findings show[ed] no more

15

than mild limitations in memory and in concentration" and so did not support her ultimate opinion. (Tr. 26).

With respect to Miller's symptoms, the ALJ found that Miller's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence. (Tr. 22-24). Miller testified that he had "constant" right shoulder pain, (tr. 41) and pain in his pelvis "every time" he tried to walk and when sitting. (Tr. 42-43). He explained that even with use of a cane, he would feel pain in his hip and rear after five minutes of walking. (Tr. 43). Miller testified that changing his colostomy bag consumed 30-80 minutes a day (tr. 44), and that the injury to his sphincter made it difficult to sit for prolonged periods of time. (Tr. 48). Miller averred that he had issues with fatigue and needed one-to-two-hour naps multiple times a week. (Tr. 48-49). He also testified that memory was a big problem for him (tr. 45), and that he was suffering at least two panic attacks a week. (Tr. 49-50).

The ALJ ultimately found Miller's testimony to be inconsistent with the objective clinical findings. As to his mental health, the ALJ noted that Miller was able to provide for personal care, prepare simple meals,

16

and perform light chores, that he drove, shopped, handled money, and was able to follow instructions. (Tr. 20). He further noted that providers did not observe significant memory deficits in examinations, that Miller's memory and comprehension seemed similar to his pre-accident status, and that Miller's cognitive-linguistic impairment was mild and appeared to be improving with therapy. (*Id.*) He found that Miller generally got along with others and that his providers reported no social issues or behavioral difficulties. (*Id.*). The ALJ further noted that Miller's providers reported no concentration issues or focus deficits, and that Miller's activities indicated an ability to manage himself. (Tr. 21). Overall, the ALJ found no more than mild limitations in any of Miller's four areas of mental health. (Tr. 20-21).

As to his physical health, the ALJ found that Miller's statements concerning the intensity, persistence, and limiting effects of his symptoms were not consistent with the medical evidence. (Tr. 26). The ALJ noted that at a June 2021 examination, Miller had no issues with his left shoulder and was walking normally, with a non-antalgic gait and without the help of a cane. (Tr. 23). He also noted that in October of

17

2021, an orthopedic examination found Miller had good ranges of motion and strength in his extremities, and that November 2021 EMG studies on Miller's right side were normal. (*Id.*). The ALJ further noted that Miller continued to improve, continued to walk without a cane at examinations, and then stopped showing up to his physical therapy. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Miller could not perform his past work but found at Step 5 that Miller could perform other jobs that existed in significant numbers in the national economy, such as an information clerk, a survey worker, and an office helper. (Tr. 27). Having reached these conclusions, the ALJ determined that Miller had not met the stringent standard prescribed for disability benefits and denied his claim. (*Id.*).

This appeal followed. (Doc. 1). On appeal, Miller challenges the ALJ's failure to include limitations from his severe impairments and other non-severe impairments, as well as the ALJ's consideration of Dr. Yocum's opinions. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

18

III.    **Discussion**

    A.    **Substantial Evidence Review – the Role of this Court**

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed

19

factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No.

3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather

the ALJ must discuss the evidence and explain the reasoning behind his decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

### B. <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes [him/her] from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits

22

under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all of the claimant's medically determinable impairments,

23

including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting*

24

*Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion

supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, in light of the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

## C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in June of 2021 after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

26

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion

27

without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

### D.  The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential.  Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154.  Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Miller first argues that the ALJ erred in failing to properly weigh the opinion of his treating physician, Dr. Yocum, and the opinion of Dr.

Katherine Ledermann, Psy.D., as compared to the state agency consultants. As we have noted, Miller's disability application was filed after the 2017 amendments to the way opinion evidence is considered. Under the current scheme, the ALJ is required to explain how persuasive he or she found an opinion to be, considering the supportability and consistency of that opinion with the objective medical evidence.

Here, the ALJ found the opinions of Drs. Clark and Cardillo to be more consistent with the objective clinical findings than the opinion of the plaintiff's treating physician, Dr. Yocum. (Tr. 24). He found that Dr. Yocum's opinion was not supported Dr. Yocum's own findings, nor by the objective clinical findings, including records showing that Miller's symptoms improved with treatment. (Tr. 25). In contrast, the ALJ found that the findings of Drs. Clark and Cardillo did support the physical health limitations implemented by the ALJ in the RFC. (Tr. 24). The ALJ pointed to specific evidence in the record showing that Miller walked with a non-antalgic gait and without a cane, had normal strength in his extremities, and was able to perform activities of daily living such as driving, shopping, light chores, and preparing meals. (*Id.*). While Miller

29

argues that the ALJ considered his activities of daily living in error, the ALJ was entitled to consider the consistency of these medical opinions with the claimant's activities of daily living. *See e.g.*, *Snyder v. Kijakazi*, 2022 WL 2734410, at *6 (M.D. Pa. May 5, 2022) (Mehalchick, M.J.) (concluding that the ALJ appropriately considered the claimant's activities of daily living when evaluating medical opinion evidence).

The ALJ similarly found that the mental health findings of Dr. Ledermann were not consistent with the objective clinical findings and longitudinal treatment records, and her own examination findings did not support her opinion. (Tr. 25-26). The ALJ identified that, while Dr. Ledermann observed Miller had a mildly depressed mood and difficulties with worrying, she did not observe any serious symptoms, such as homicidal or suicidal thoughts, delusions, or hallucinations. (Tr. 24). The ALJ noted Dr. Ledermann found mild impairments in attention, as well as mild impairments in concentration and memory skills, but these were offset by other findings suggesting minimal mental health problems. (*Id.*) Those findings included Miller's abilities to count and perform serial 3s, remember three objects immediately, and remember five digits forward

and four backward. (*Id.*). The mild impairments caused Dr. Ledermann to diagnose depressive disorder, generalized anxiety disorder, and PTSD. (*Id.*). But the ALJ found those diagnoses countervailed by other evidence: Miller's average cognitive functioning, his activities of daily living (making simple meals, helping with laundry and shopping), and the normal results of his MRI brain scan. (*Id.*). For these reasons and others, the ALJ held that the severity of limitations as characterized by Dr. Ledermann was not consistent with the objective clinical findings and the longitudinal treatment records. (Tr. 25).

In contrast, the ALJ found that the findings of Drs. Gavazzi and Williams were more consistent with the objective clinical findings and did support the mental health limitations that the ALJ implemented. (Tr. 25). The ALJ reasoned that these opinions found Miller's impairments to be mild impairments, with mild symptoms, that were treatable with routine and conservative medication and without more specialized or intensive treatment. (*Id.*). The ALJ also noted these records indicate Miller is expected to continue to improve. (*Id.*). Ultimately, the ALJ concluded that these opinions were more consistent

31

with and supported by the objective medical record than Dr. Ledermann's opinion. (*Id.*).

Miller also argues that the ALJ abused his discretion by failing to consider Miller's limitations from his severe impairments when crafting the RFC. Specifically, Miller contends that the ALJ failed to include limitations for his wrist and knee pain, numbness, shoulder pain, the use of a cane, and fatigue. Additionally, Miller argues that the ALJ failed to include mental limitations stemming from his memory and neurocognitive problems. (Doc. 9 at 15-16). However, our review of the ALJ's decision indicates that the ALJ did consider these severe impairments.

It is well established that while the ALJ "must include all 'credibly established limitations' in the hypothetical [submitted to the vocational expert,]" the Third Circuit does not require that "every impairment alleged by a claimant[,]" be submitted, rather "the ALJ is only required to submit credibly established limitations." *Zirnsak*, 777 F.3d 615 (citations and quotation marks omitted). The ALJ has discretion in determining whether a limitation is credibly established, particularly

"where a limitation is supported by medical evidence, but is opposed by other evidence in the record[.]" *Id.* (citing *Rutherford*, 399 F.3d at 553). The ALJ cannot reject evidence of a limitation for an unsupported reason but does have the discretion to include a limitation without medical evidentiary support if it is otherwise found credible. *Id.*

Here, the ALJ's decision explained that the RFC determination included all of the credibly established limitations based on the medical records and the opinion evidence. The decision identifies four severe impairments: residual effects of fractures of ribs, left shoulder, and pelvis, and residual effects of colostomy. In crafting the RFC, the ALJ cites to specific portions of the medical record in discussing those impairments. The ALJ also explained why he determined that the more restrictive limitations set forth in the opinions of Dr. Yocum and Dr. Ledermann were not persuasive, finding that these limitations were not supported by or consistent with the objective medical evidence. Accordingly, we conclude that the ALJ included all of Miller's credibly established limitations in the RFC determination, and further, adequately explained why he rejected certain limitations.

33

Miller also argues that the ALJ did not sufficiently consider Miller's non-severe impairments in crafting the RFC, including Miller's memory loss, neurological issues, PTSD, pain and weakness in the right forearm and thigh, right shoulder pain/tendonitis, chronic low back pain, and thoracic strain.   (Doc. 9 at 1-2).   First, as to the mental health impairments, the ALJ considered Miller's memory loss and found that Miller's alleged limitations in this regard were inconsistent with his ability to do tasks inside and outside the home and a lack of significant memory deficits in the examination setting.   The ALJ also, albeit briefly, discussed Miller's PTSD in his consideration of the paragraph B criteria, but ultimately found only mild limitations in these areas of mental functioning.   Accordingly, we conclude that the ALJ's decision adequately considered these impairments in making his determination.

As to Miller's allegations of "neurological issues," and his other alleged physical impairments, such limitations are not supported by the record.   While Miller asserts that his neurological issues are documented in Dr. Yocum's records, a review of the records indicates a single finding of "dizziness and headaches" from March of 2022. (*See* Tr. 816).   There

are no other documented issues or diagnoses that support Miller's allegations in this regard.

As to the other alleged physical impairments, we are not persuaded that these impairments are sufficiently supported by the record to require explicit consideration by the ALJ. There are sparse, if any, records concerning Miller's alleged pain and weakness in his forearm and thigh. As to his right shoulder and low back pain, while there are treatment records noting that Miller suffered from these impairments, Miller has not demonstrated that the failure to include any further physical limitations other than what was set forth in the RFC was harmful. Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial rights'"; that is, if the error "likely affects the outcome of the proceeding, . . ." *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Here, Miller contends, without support from the record, that further physical limitations would have rendered him unable to perform

the occupations identified by the vocational expert because he would need unscheduled breaks.  However, Miller points to no record evidence to establish such a limitation, other than generally referring to treatment records from Dr. Yocum and his own testimony, both of which the ALJ explained were not supported by the objective medical evidence. Accordingly, we conclude that any failure to include further physical limitations from these impairments is harmless and does not require a remand.

Although the record in this case contained abnormal findings during the relevant period, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154.  Given that the ALJ considered all the evidence and adequately explained his decision for including or discounting certain limitations as established by the evidence, we find no error with the decision.  Accordingly, under the deferential standard of review that applies to appeals of Social Security disability

determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision will be affirmed.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

<u>*s/ Daryl F. Bloom*</u>
Daryl F. Bloom
Chief United States Magistrate Judge

Dated: December 12, 2024

37